# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 16, 2021        Decided December 2, 2022

No. 20-1453

AMERICAN CLEAN POWER ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

D. E. SHAW RENEWABLE INVESTMENTS, L.L.C., ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Gabriel Tabak* argued the cause and filed the briefs for petitioner.

*Bruce A. Grabow* and *Jennifer Brough* were on the joint briefs for intervenors in support of petitioner.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

2

*Christopher R. Jones* argued the cause for intervenors in support of respondent.  With him on the joint brief were *Miles H. Kiger*, *Wendy N. Reed*, *Wendy B. Warren*, *Matthew J. Binette*, and *Ilia Levitine.  Kari Valley* entered an appearance.

Before: MILLETT, RAO, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

Opinion concurring in part and dissenting in part by *Circuit Judge* RAO.

WALKER, *Circuit Judge*:  This case is the latest episode in a long-running dispute over how to fund upgrades to power lines.  On one side are owners and operators of power lines; we'll call them "transmission owners."  On the other side are power generators.

In the orders on review, FERC ruled for the transmission owners.  That decision might have been reasonable.  But it was not reasonably explained.  In particular, FERC failed to adequately address new evidence that many MISO-region transmission owners also own generators.  Because the Administrative Procedure Act requires a reasonable explanation, we remand to FERC.

I

A

When power generators build new facilities or update their existing facilities, they need to connect those facilities to the power grid.  That connection in turn often requires transmission owners to upgrade their power lines to accommodate the power influx.  *See Ameren Services Co. v. FERC*, 880 F.3d 571, 572

3

(D.C. Cir. 2018). "Direct" transmission owners must upgrade their power lines because their lines directly connect to the new or updated generators. Likewise, "indirect" transmission owners must often upgrade their power lines because they are downstream of the direct transmission owners' lines.

In the Midcontinent Independent System Operator region, which spans much of middle America and part of Canada, generators pay for almost the whole cost of those upgrades. But there are two relevant ways in which they can pay. Option A: The generators can pay for the upgrades up front. Option B: The transmission owners can initially fund the upgrades and charge the generators over time to recoup those costs. Some transmission owners prefer Option B because they can earn a profitable return on their investment as they recoup their initial costs.

Years ago in the MISO region, direct transmission owners had unilateral funding authority, letting them choose between the two options. But indirect transmission owners did not.

B

In 2015, an indirect transmission owner called Otter Tail Power Company filed a complaint with FERC challenging that differential treatment. Under Section 206 of the Federal Power Act, FERC may, on its own or on a complaint, change a utility's rate through a two-step process. First, it must find that the current rate is "unjust, unreasonable, unduly discriminatory, or preferential." 16 U.S.C. § 824e(a). Second, it must determine a "just and reasonable" replacement rate. *Id.*

FERC agreed with Otter Tail. It found that direct and indirect transmission owners are similarly situated and thus should have the same ability to choose how to fund power line

4

upgrades. *MISO, Inc. Otter Tail Power Co. v. MISO, Inc.*, 151 FERC ¶ 61,220 (Jun. 18, 2015); *Otter Tail Power Co. v. MISO, Inc.*, 153 FERC ¶ 61,352 (Dec. 29, 2015).

But rather than leveling up and granting indirect transmission owners the same unilateral funding authority that direct transmission owners enjoyed, FERC leveled down by taking away all transmission owners' unilateral funding authority. *Otter Tail*, 151 FERC ¶ 61,220, at ¶ 48. FERC did so by initiating a new proceeding to determine whether it is unjust and unreasonable for transmission owners to enjoy unilateral funding authority. FERC answered yes because, in its view, transmission-owner funding could allow certain transmission owners to discriminate among generators, which is prohibited by the Federal Power Act. *Id.*

In *Ameren Services Co. v. FERC*, this Court vacated and remanded FERC's orders. 880 F.3d 571 (D.C. Cir. 2018). We noted that there *would* be a discrimination concern *if* transmission owners still owned generation facilities, like they did in the "bad old days." *Id*. at 578. But in *Ameren* there was only one petitioning transmission owner that owned a generator, and we found an "absence of evidence" of potential discrimination. *Id*.

*Ameren* also held that FERC should have considered that its decision could force transmission owners to incur the financial risks of generator-funded upgrades without the opportunity for a profit. *Id.* at 581-82. We declined to decide whether those enterprise-risk concerns required a particular result until FERC "developed a record by considering" them. *Id.* at 584.

After *Ameren*, FERC still needed to adjudicate the original Otter Tail complaint — the one in which Otter Tail had alleged

5

that it is discriminatory for FERC to deny unilateral funding authority to indirect transmission owners when direct transmission owners enjoy such authority. *Ameren* had not required FERC to reach a particular outcome in the Otter Tail complaint. But without additional briefing, FERC decided that all transmission owners in MISO should have the unilateral authority to choose to fund upgrades. *MISO, Inc. Otter Tail Power Co. v. MISO, Inc.*, 164 FERC ¶ 61,158 (Aug. 31, 2018).

Then, FERC took briefing on whether to apply that new rule retroactively from the point that this litigation began. The generators moved for rehearing on whether FERC's new regime would lead to undue discrimination.

In a second order, FERC reaffirmed the first post-remand order and made its rule retroactive. *MISO, Inc. Otter Tail Power Co. v. MISO, Inc.*, 169 FERC ¶ 61,233 (Dec. 20, 2019).

Finally, in response to a rehearing request regarding the retroactivity decision, FERC issued a third order affirming its decision. *MISO, Inc. Otter Tail Power Co. v. MISO, Inc.*, 172 FERC ¶ 61,248 (Sept. 17, 2020).

C

The American Clean Power Association, an association of generators that operate in the MISO region, now petitions us to review those orders. Other generators operating in the MISO region have intervened on the Petitioner's side. And transmission owners have intervened as Respondents in support of FERC.

The Petitioner argues that FERC failed to follow our command in *Ameren* to "develop a record." It also argues that it was arbitrary and capricious for FERC to give transmission

6

owners the unilateral authority to fund power line upgrades. The Petitioner-Intervenors added a third argument: that FERC incorrectly made its decision retroactive.

## II

Our jurisdiction extends only to arguments that a party raised in a rehearing application before FERC, "unless there is reasonable ground for failure so to do."  16 U.S.C. § 825l(b); *see also New England Power Generators Association, Inc. v. FERC*, 879 F.3d 1192, 1198 (D.C. Cir. 2018).  We therefore lack jurisdiction to consider the Petitioner-Intervenors' argument that FERC improperly made its decision retroactive. The Petitioner-Intervenors have not shown that they sought rehearing of FERC's retroactivity decision.  And they have not argued that there was a "reasonable ground" for their failure to do so.  *California Department of Water Resources v. FERC*, 306 F.3d 1121, 1126 (D.C. Cir. 2002) ("an intervenor may raise an issue" only "if the intervenor has preserved the issue in its own petition for rehearing before the Commission").

That leaves two issues: whether FERC complied with our *Ameren* remand order and whether FERC adequately explained its decision to require universal, unilateral transmission owner funding authority in the MISO region.  We have jurisdiction to hear those claims under 16 U.S.C. § 825l(b).

We conclude that FERC did comply with our *Ameren* order, but it did not adequately explain its funding decision as the Administrative Procedure Act requires.

## A

FERC complied with our *Ameren* remand order.  There, we told FERC to "develop[] a record *by* considering" the

7

transmission owners' enterprise-risk argument. *Ameren Services Co. v. FERC*, 880 F.3d 571, 584 (D.C. Cir. 2018) (emphasis added). That instruction suggested no particular briefing. Nor did it demand any additional evidence for a record that was already voluminous. Rather, it required nothing more than FERC "considering" the enterprise-risk argument and putting that consideration on the "record" for our review. *Id.*

On remand, FERC did just that: It considered the enterprise-risk argument and rendered a decision on its merits in the record for us to review.

B

FERC's decision to grant unilateral funding authority to all transmission owners failed to satisfy the Administrative Procedure Act's arbitrary-and-capricious standard. *See Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017); 5 U.S.C. § 706(2)(A). Although FERC's decision may ultimately prove to be "reasonable," it was not "reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Before providing our reasons for that conclusion, we must first address a preliminary matter. FERC asserts that the Petitioner did not seek rehearing on FERC's decision to grant unilateral funding authority to all transmission owners. But in fact, the Petitioner did exactly that. In its request for rehearing, the Petitioner argued that FERC "reversed its 'determination that transmission owners and affected system operators should not be allowed the unilateral right to elect to provide initial funding for network upgrades,' and did so without any articulated reasoned explanation or record evidence to support[] its reversal." JA 193 (emphasis added) (footnote omitted). An "affected system operator" is an indirect

8

transmission owner. *MISO, Inc. Otter Tail Power Co. v. MISO, Inc.*, 164 FERC ¶ 61,158, at ¶ 6 (Aug. 31, 2018) ("This indirectly-connected transmission owner is known as the affected system operator.").

As to the merits of the Petitioner's argument, the Petitioner does not seriously dispute FERC's determination that direct and indirect transmission owners are similarly situated entities, so treating them differently is unreasonable under the Federal Power Act. *Otter Tail*, 164 FERC ¶ 61,158, at ¶ 34.[1] But the Petitioner argues that FERC violated the Administrative Procedure Act by not adequately explaining its decision to solve that problem by giving unilateral funding authority to all transmission owners, rather than by denying unilateral funding authority to all transmission owners. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (An agency must "reasonably consider[] the relevant issues and reasonably explain[] [its] decision."); *TransCanada Power Marketing Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (The duty to reasonably explain extends to "all cases," including cases in which FERC sets new just and reasonable rates.).

We agree with the Petitioner that FERC failed to reasonably explain its decision. In particular, it gave short shrift to the Petitioner's concern that transmission owners might discriminate in favor of generators they own.

In the proceedings before FERC, the Petitioner gave plausible reasons for that concern. It pointed out that even

---

[1] The Petitioner's briefs include no express argument that direct transmission owners and indirect transmission owners are not similarly situated. And they do not show that the Petitioner raised such an argument in a petition for rehearing before FERC. *See* 16 U.S.C. § 825l(b).

9

though only one of the petitioning transmission owners in *Ameren* owned generators, many other transmission owners in the MISO region own generators. And *Ameren* itself noted that "if the transmission owners still owned integrated generation facilities, that *would* present a competitive motive" for transmission owners with unilateral funding authority to discriminate among generators. 880 F.3d at 578 (emphasis added).

In response, after accepting that many transmission owners in the MISO region do indeed own generators, FERC concluded that the generators' concerns about potential discrimination did not outweigh the transmission owners' enterprise-risk concerns. In support, FERC said the Petitioner did not "show why the ability of [generators] to challenge costs before the Commission, a point on which the Court relied, is inadequate to address any concerns with potential undue discrimination." *MISO, Inc. Otter Tail Power Co. v. MISO, Inc.*, 169 FERC ¶ 61,233, at ¶ 38 (Dec. 20, 2019) (footnote omitted).

There was, however, something important missing from FERC's orders: an assessment of the risk of discrimination and an explanation of why individualized proceedings provide generators with sufficient protection against that risk.

At oral argument, counsel for the Respondent-Intervenors supporting FERC gave a relatively detailed assessment and explanation. According to him, any concerns about discrimination are largely alleviated by the regulatory regime in place since 1996. That regime uses transparency to reduce the risk that transmission owners will provide preferential treatment to the generators they own. For example, transmission owners use publicly available pro forma contracts to build power-line upgrades with generators, and they charge

10

rates of return regulated by FERC.  That may have been one reason why there was no evidence of discrimination at the time of *Ameren*.  *See* Transcript of Oral Argument 52, 56-57.

But that is not what FERC's orders said.  In contrast to the Respondent-Intervenors' explanation, FERC's reasoning was conclusory.  So even though FERC's decision on this point might ultimately prove to be "reasonable," it was not "reasonably explained" as required by the Administrative Procedure Act.  *Prometheus*, 141 S. Ct. at 1158.  FERC had the chance to explain itself at two different steps in its proceedings. It could have done so when it found that the unilateral funding option was not unjust or discriminatory, or later when it remedied the disparity between direct and indirect transmission owners in the Otter Tail proceeding.  *Cf.* Partial Dissent at 7-8 (suggesting that FERC had no obligation to explain itself at either step); *see also TransCanada Power Marketing*, 811 F.3d at 12 ("[I]n all cases, the Commission must explain its reasoning.").  But FERC failed to do so at either point.[2]

Nothing in *Ameren* excused FERC from the requirement to reasonably explain its decision.  Indeed, *Ameren* emphasized that "if the transmission owners still owned integrated

---

[2] The Petitioner made this argument in its initial brief when it argued that FERC relied on "summary conclusions" that failed to "address the underlying discrimination and enterprise risk."  Pet. Br. 24.  In response, FERC made a counterargument: costs can be challenged through individual adjudications.  Resp. Br. 41.  Then, in its reply brief, the Petitioner replied to FERC's counterargument regarding individual adjudications.  Pet. Reply Br. 11, 15.  And although the Petitioner's initial brief did not address FERC's counterargument about individual adjudications, there was no forfeiture because it could not have been expected to reply to the counterargument until the counterargument had been made.

11

generation facilities, that would present a competitive motive" to discriminate in favor of their own facilities. *Ameren*, 880 F.3d at 578. And the Petitioner presented evidence to FERC that, contrary to the facts before the *Ameren* court, a majority of transmission owners in the MISO region own generators. Putting those pieces together, the Petitioner showed that many transmission owners have an incentive to discriminate between their own generators and would-be competitor generators.

FERC was obligated to respond to that evidence, which the Petitioner said was enough to render unilateral funding "unjust, unreasonable, unduly discriminatory, or preferential." 16 U.S.C. § 824e(a). Instead, FERC simply said that the evidence of generation ownership was inadequate to demonstrate discrimination, without explaining why this was so. That was not enough. Petitioner's evidence, coupled with *Ameren*'s observation about the potential for discrimination, showed that restoring and extending the unilateral funding option posed a discrimination risk. FERC acted arbitrarily and capriciously by failing to meaningfully respond to Petitioner's arguments. *See, e.g.*, *Public Service Electric & Gas Co. v. FERC*, 989 F.3d 10, 19-20 (D.C. Cir. 2021).

Nor is FERC excused by the fact that the two types of transmission owners are similarly situated. To be sure, that is one argument in favor of applying the unilateral funding rate to indirect transmission owners: a different approach might create unlawful disparities between transmission owners. But in deciding that the rates could not be applied to just one set of transmission owners, FERC took action which required explanation. First, it determined that it was unjust and unreasonable to distinguish between the two types of transmission owners with respect to unilateral funding. Second, it extended the unilateral funding option to indirect transmission owners. While this rate had been previously

12

approved for direct transmission owners, it was a new rate for indirect transmission owners.

FERC was required to reconcile this decision with the substantial evidence showing that unilateral funding was potentially discriminatory because a majority of MISO-region transmission owners also owned generation facilities. And, again, whether it was required to explain it at step one or step two of the 206 proceeding, it was arbitrary and capricious when FERC failed to do so at either step.

True, the required explanation would answer a different question depending on when FERC offered it. At step one: why does FERC conclude that the Petitioner has not met its burden of showing that unilateral funding authority is unjust and unreasonable? At step two: why does FERC conclude that unilateral funding authority is just and reasonable? But at either time and under either standard, the Administrative Procedure Act requires more than a conclusory explanation for an agency action. And FERC offered nothing more than that in response to the Petitioner's concern that — to again quote *Ameren* — "transmission owners . . . own[ing] integrated generation facilities . . . present[s] a competitive motive" for discrimination. 880 F.3d at 578.

*   *   *

We therefore remand for FERC to adequately explain its decision. But we do so without vacating FERC's orders "[b]ecause there seems to be a significant possibility that [FERC] may find an adequate explanation for its actions, and, in any event, it appears that the consequences of its current ruling can be unraveled if it fails to." *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008); *see also United Steel v. Mine Safety & Health Administration*, 925

13

F.3d 1279, 1287 (D.C. Cir. 2019) ("The appropriateness of the remand-without-vacatur remedy turns on two factors: '(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.'" (quoting *Heartland Regional Medical Center v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009))).

*So ordered.*

RAO, *Circuit Judge*, concurring in part and dissenting in part: Without vacating the challenged orders, the majority remands to the Federal Energy Regulatory Commission ("FERC") for further explanation of its decision. But no further explanation is necessary. In light of our strong suggestion in *Ameren Services Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018), that the "unilateral funding option" was valid and perhaps even required, FERC determined this option was not unjust or unreasonable. FERC then reasonably extended the unilateral funding option to all interconnection contracts, eliminating the disparate treatment between direct and indirect transmission owners. The majority's demand for further explanation rests on a misapprehension of the precise questions before FERC on remand.

I agree with the majority that the petitioner's retroactivity argument was not exhausted and that FERC was not required to seek new evidentiary submissions on remand. I respectfully dissent, however, because the Commission properly and reasonably addressed the questions raised by the *Ameren* remand.

## I.

I mostly rely on the majority's statement of the facts, but a proper evaluation of the petitioner's challenge requires understanding this court's previous decision in *Ameren* and the actions taken by FERC on remand.

Section 206 of the Federal Power Act governs challenges to existing rates and may be invoked by a party's complaint or upon the Commission's own motion. 16 U.S.C. § 824e(a). Importantly, a section 206 proceeding has two steps: FERC first evaluates whether an existing rate or tariff provision is "unjust, unreasonable, unduly discriminatory or preferential." *Id.* Then, if such a finding is made, FERC "shall determine the

2

just and reasonable rate … or contract [term] … and shall fix the same by order." *Id.*

FERC issued orders in two distinct section 206 proceedings following a complaint brought by Otter Tail Power Company, an indirect transmission owner. In the first proceeding, FERC responded to Otter Tail's complaint by concluding it was unduly discriminatory for the Midcontinent Independent System Operator ("MISO") to allow direct transmission owners but not indirect transmission owners to unilaterally finance upgrades. *See Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220 at P 47 (June 18, 2015) [*Otter Tail Complaint Order*].

In the second section 206 proceeding, brought on FERC's own motion, FERC found the unilateral funding option unjust and unreasonable because a unilateral option to fund upgrades creates opportunities for transmission owners to give preferential treatment to generators they own and to impose additional costs on other generators. *Otter Tail Power Co.*, 153 FERC ¶ 61,352 at PP 29–33 (Dec. 29, 2015). FERC addressed these problems and the disparity between the two contracts by eliminating the unilateral funding option altogether. *See id.* P 29.

We vacated these two orders in *Ameren*, leaving open the possibility that the agency could lawfully reinstate its orders after developing an appropriate record on remand. 880 F.3d at 584–85. But we expressed serious concerns about any decision to eliminate the unilateral funding option. Absent such an option, "transmission owners will be forced to assume certain costs that are never compensated," such as the environmental or reliability risk that comes with an enhanced electrical grid. *Id.* at 580. And "more fundamental[ly]," eliminating the unilateral funding option would "require [transmission owners]

3

to act, at least in part, as … nonprofit business[es]." *Id.* at 581. If transmission owners were required to upgrade their grids, but without earning a profit on the upgrades, the overall profitability of transmission companies would be diminished. *Id.* at 581–82. Burdened with "potentially large non-profit appendages," transmission companies would find it difficult to attract investors. *Id.* at 581. We vacated the orders because we doubted that FERC's "weak" justifications of its orders could be salvaged. *Id.* at 585.

On remand, FERC made two threshold findings. First, FERC changed course and found that the unilateral funding option was not unjust or unreasonable. *Midcontinent Indep. Sys. Operator, Inc.*, 164 FERC ¶ 61,158 at P 28 (Aug. 31, 2018) [*Remand Order*]. The agency expressly tied this conclusion to the reasoning in *Ameren*. After the American Clean Power Association ("ACPA") contested FERC's decision, the Commission stated that nothing the ACPA had submitted could "overcome" the *Ameren* court's "skeptic[ism] of the idea that a transmission owner need not earn a profit on all parts of its business." *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,233 at P 39 (Dec. 20, 2019) [*Remand Rehearing Order*]. FERC concluded it lacked adequate evidence to support its pre-*Ameren* determination that the unilateral funding option was "unduly discriminatory." *Id.* P 37; *see also Remand Order* P 28 ("[W]e find that there was not enough evidence in the record to sustain the Commission's findings in the vacated orders."). *Ameren* had effectively restored the unilateral funding option as an approved tariff provision and therefore FERC had no reason to make an affirmative finding that the unilateral funding option was just and reasonable.

Second, with respect to the Otter Tail complaint challenging the disparate treatment between direct and indirect

4

transmission owners, *Ameren* had not disturbed FERC's earlier conclusion that uniformity was required. FERC therefore reaffirmed its finding that differential treatment was unjust and unreasonable under section 206. S*ee Remand Order* P 34. Because the differential treatment was unlawful, the Commission had to establish a new just and reasonable rate, the second part of the section 206 proceeding. FERC imposed uniformity by choosing an existing rate, namely the unilateral funding option, and ordering that it be available in both direct and indirect connection contracts. *Id.*

In its petition for review, the ACPA disputes FERC's findings and challenges the extension of the unilateral funding option to indirect transmission contracts.

## II.

FERC's decisions were reasonable and reasonably explained. The majority maintains that at some point FERC had to say more, but this conclusion blurs the distinction between the two proceedings and overreads *Ameren* and FERC's procedural obligation on remand from this court.

## A.

FERC first addressed whether it could support its pre-*Ameren* finding that the unilateral funding option was unjust or unreasonable. Recall that, following *Ameren*'s vacatur, the unilateral funding option was effectively restored as an approved tariff provision. Because the option was an existing tariff provision, FERC had to affirmatively find that the option was unlawful before it could eliminate and replace it. *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) ("[S]ection 206 mandates a two-step procedure that requires FERC to make an explicit finding that the *existing rate* is unlawful before setting a new rate.") (emphasis added). FERC determined, however,

5

that it could not meet the first step of this "dual burden," *id.*, because "there was not enough evidence in the record to sustain the Commission's" previous finding that the option was not just and reasonable, *Remand Order* P 28. In making this evaluation, FERC reasonably gave substantial weight to *Ameren*, in which we strongly suggested that the unilateral funding option was not unlawful and perhaps was even *required*. *See* 880 F.3d at 581 (expressing concern that eliminating the unilateral funding option would force transmission owners to "act, at least in part, as a nonprofit business").

The majority argues that FERC should have done more to respond to the ACPA's arguments that the risk of discrimination was greater than the *Ameren* court realized. While the *Ameren* court had assumed electricity providers in the MISO region were not vertically integrated, the ACPA explained that the majority of such providers were in fact vertically integrated. In response, FERC acknowledged the fact of vertical integration but concluded that this was "not adequate by itself to demonstrate that there is undue discrimination." *Remand Rehearing Order* P 38. The Commission also explained that concerns about potential discrimination could be addressed through case-by-case challenges by transmission owners and that the ACPA had not demonstrated such challenges would be inadequate. *Id.* The Commission acknowledged the ACPA's evidence but found it inadequate to overcome the countervailing considerations highlighted by the *Ameren* court in favor of the unilateral funding option. On the evidence before it, FERC reasonably concluded it could not find the unilateral funding option unjust or unreasonable.

The majority places great weight on the *Ameren* court's recognition that the presence of vertical integration "would

6

present a competitive motive." 880 F.3d at 578. But FERC properly considered the ACPA's evidence of vertical integration. It simply found that such evidence could not overcome the *Ameren* court's overwhelming view that eliminating the unilateral funding option (1) did not "rest on economic theory [or] logic"; (2) would restrict the return on capital required by the Supreme Court in *FPC v. Hope National Gas Co.*, 320 U.S. 591, 603 (1944); and (3) would force investors "to accept risk-bearing additions to their network with zero return." *Ameren*, 880 F.3d at 578, 581, 582.

Moreover, the *Ameren* remand from our court did not focus on the existence of vertical integration, but on the fact that FERC was required to provide "reasoned consideration" of the economic risks and capital-attraction problems for transmission owners. *Id.* at 582. FERC adequately addressed both the ACPA's new evidence and this court's substantial economic concerns.[1]

---

[1] I would also note that the only relevant section 206 proceeding here was the one that FERC had instituted "upon its own motion" under section 206 prior to *Ameren*. 16 U.S.C. § 824e(a). Whether to institute a proceeding in that way was committed to FERC's discretion, and matters committed to an agency's discretion by law are generally not reviewable. *See* 5 U.S.C. § 701(a)(2). FERC therefore may have lacked *any* obligation, after *Ameren*, to revisit the lawfulness of the unilateral funding option on its "own motion." If FERC had declined to do so, that decision may have been unreviewable. *Cf. Heckler v. Chaney*, 470 U.S. 821, 837 (1985) (holding that courts presume "agency decisions not to institute proceedings are unreviewable" under the APA). Because on remand FERC did reconsider whether the unilateral funding option was unjust or unreasonable, its decision must comport with the APA's requirements of reasoned decisionmaking. *See Am. Gas Ass'n v.*

7

FERC properly concluded the record lacked evidence to make a finding that the unilateral funding option was unjust or unreasonable or unduly discriminatory.[2] Relying on this court's decision in *Ameren*, FERC reasonably explained its decision not to eliminate this existing tariff provision.

B.

FERC also adequately explained why it applied the unilateral funding option to both direct and indirect transmission owners when resolving the original Otter Tail complaint.

Otter Tail had claimed it was unlawful to treat direct and indirect transmission owners differently. On remand from *Ameren*, FERC reaffirmed its finding that the disparity between the direct and indirect connection contracts was unjust and unreasonable. *Remand Order* P 34 (noting that the *Ameren* court had not overturned FERC's prior determination that "the same funding options should be available" to direct and indirect transmission owners alike). At the first step of the Otter Tail section 206 proceeding, therefore, FERC concluded that the disparate treatment was indeed unlawful.

After making this finding, the second step of the section 206 proceeding required FERC to establish a just and reasonable rate that would remedy the disparity between the

---

*FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010); Maj. Op. 10. For the reasons stated above, FERC easily met these standards.

[2] I agree with the majority that our *Ameren* remand did not require any particular fact gathering procedures and that FERC complied with our directive to "develop[] a record by considering" the arguments it failed to address the first time. *Ameren*, 880 F.3d at 584; Maj. Op. 6–7.

8

two types of contracts. *Ameren* had already restored the unilateral funding option as an approved tariff provision and, as everyone agrees, indirect and direct contracts are materially indistinguishable for the purposes of that option. *See* Maj. Op. 8 n.1. FERC therefore concluded it was "just and reasonable" to include the unilateral funding option in the indirect connection contracts to achieve parity with the direct connection contracts. *See id.* P 34. This resolution of the Otter Tail complaint was reasonable, indeed obvious: if the problem is a lack of uniformity, uniformity is the solution.

The majority maintains that FERC needed some further explanation somewhere. But this argument rests on a misunderstanding of the proceedings. The Otter Tail petition did not question the validity or lawfulness of the unilateral funding option (which is precisely why FERC had instituted a separate proceeding to resolve that question). FERC therefore did not have to set a "new rate for indirect transmission owners," Maj. Op. 12, but only remedy the disparate treatment between similarly situated transmission owners. The lawfulness of the unilateral funding option was simply not in play. FERC more than adequately explained why, in equalizing treatment between direct and indirect transmission owners, it would allow both to use the unilateral funding option.

III.

Finally, I note that the circumstances for remand without vacatur are not present in this case. The majority holds FERC's orders lack the reasonable explanation required by law. Maj. Op. 8. In that case, the ordinary and appropriate remedy is vacatur of the agency's orders. Although the remedy of remand without vacatur is available under circuit precedent, it is an exception to be used only in "limited circumstances" involving unusually "disruptive consequences," such as "when vacatur

9

would disrupt settled transactions" and it would be difficult or impossible to restore the status quo ante. *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518–19 (D.C. Cir. 2020). The fact that we might anticipate the agency has some unstated good reasons for its decision is not sufficient to avoid vacatur. Remanding without vacatur rarely provokes any action from the agencies and leaves courts in the posture of merely prodding an agency to provide a few more words. While carrying a pragmatic patina, the toothless "remedy" of remand without vacatur diminishes the authority of the courts to hold agencies accountable for reasoned decisionmaking.

\* \* \*

FERC undoubtedly could have made our review easier by explaining its procedural steps with greater clarity. But once we recognize the two separate proceedings at issue and the precise obligations imposed by the *Ameren* remand, FERC's decision was plainly reasonable and reasonably explained. For the foregoing reasons, I respectfully dissent.